## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brett McNeal,

                    Plaintiff,                Civ. No. 15-3442 (RHK/SER)

**MEMORANDUM OPINION**

v.                                          **AND ORDER**

University of Minnesota Physicians,

                    Defendant.

Megan A. Spriggs, Richard A. Williams, Jr., R.A. Williams Law Firm, P.A., St. Paul, Minnesota, for Plaintiff.

Samuel W. Diehl, Matthew P. Webster, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

In this action, Plaintiff Brett McNeal has sued his former employer, Defendant University of Minnesota Physicians ("UMP"), alleging that it terminated his employment on account of his race and in retaliation for his complaints about racism, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Presently before the Court is UMP's Motion for Summary Judgment. For the reasons that follow, the Motion will be granted.

## BACKGROUND

Viewed in the light most favorable to McNeal, the record reveals the following facts, most of which are undisputed.[1]

## I.   UMP and McNeal

UMP is the multi-specialty group medical practice for the University of Minnesota Medical School faculty.  See https://www.umphysicians.org/mission-and-leadership/advancing-medicine (last visited January 19, 2017).  It is an independent nonprofit governed by a board of directors, employing more than 900 physicians and 1,600 other health professionals and staff, and providing healthcare services through more than 50 specialty clinics and five family-medicine clinics.  Id.

McNeal, an African American, has worked in human resources ("HR") since the late 1990s.  (McNeal Dep. at 15.)  From 1997 to 2007, he was employed as an HR generalist for the City of Minneapolis.  (Id.)  There, his supervisor was Ann Eilbracht, the City's HR Director.  (Id. at 16-17.)  McNeal and Eilbracht had a good working relationship and, after being hired as UMP's Vice President of HR, she recruited McNeal to UMP.  (Id. at 17, 20-21.)  In January 2007, she offered him a position as UMP's Manager of Diversity and Recruitment, which he accepted.  (Id. at 21.)  In this role, McNeal managed diversity recruitment at UMP, performed HR training sessions,

---

[1] The Court notes that the paltry record in this case is somewhat unusual.  Typically in an employment-discrimination case, the parties submit the transcripts of depositions of each of the persons involved in the events giving rise to the plaintiff's claim, as well as numerous documents.  Here, however, there is a paucity of documents in the record, and only one deposition transcript has been submitted, that of McNeal; the rest of the witnesses have offered "testimony" via Affidavit.

reviewed and revised UMP's HR policies, conducted investigations of HR complaints, and handled other HR-related duties.  (Id. at 25-26.)  Several HR employees reported to McNeal, who in turn reported to Eilbracht.  (Nyhus Aff. Ex. B; McNeal Dep. at 22-23.)

The record contains little information regarding McNeal's performance during his employment with UMP.  The only review in the record, entitled "2010 Performance Review Tool," shows that he was generally meeting expectations, although he was below expectations in several areas.  (Spriggs Aff. Ex. A at UMP254-55.)  He received annual raises during most of his employment, although he did not receive a raise in 2009 because his performance was rated below expectations.  (2d Nyhus Aff. Ex. G.)  By 2010, he was making nearly $100,000 per year.  (Id.)

According to McNeal, he succeeded in his job despite UMP being permeated with institutional racism.  The thrust of his claims is that he was hired to diversify UMP's workforce but was met with "continuing efforts" to undermine him when he performed those duties, due to UMP's "racist" culture.  For example, he claims that on several occasions, UMP ignored protocols designed to ensure race was not factored into hiring decisions and, when he raised the issue, *he* was accused of being racist and favoring black employees.  (McNeal Aff. ¶¶ 16-17.)  Along the same lines, he claims that on several occasions, he was accused by management of unfairly protecting African Americans who had been charged with misconduct.  In one instance, according to McNeal, Senior Vice President Ann Peterson recommended to Eilbracht that she terminate McNeal's employment because he was a racist, but Eilbracht declined to do so. (McNeal Dep. at 107.)  McNeal also asserts that when non-minority job applicants were

passed over in favor of minority ones, he was accused by managers of unfairly favoring

minorities and being intent upon "protect[ing] African Americans," even though the non-

minorities had inferior qualifications.  (Washington Decl. ¶ 18; McNeal Dep. at 74-75.)

McNeal also points to a handful of harassing incidents he claims he suffered at

UMP.  For instance, he alleges that various employees "spread rumors" about him

engaging in inappropriate relationships with subordinates.  (McNeal Dep. at 111-12.)  He

also notes that in 2008, he received several racially charged emails over a six month

period, using terms such as "ghetto boy" and "piece of black shit."  (Spriggs Aff. Ex. A at

UMP84-128.)  The emails were anonymous but purportedly were sent by someone who

had attended one of McNeal's training programs.  (Id. at UMP87.)  McNeal forwarded

the emails to Eilbracht, who found them "disgusting" and "disturbing" and asked UMP's

information-services department to attempt to trace them.  (Id. at UMP85, 89-90, 98.)

The sender could not be determined, but UMP still tried to block the sender from sending

further emails to McNeal.  (Id. at UMP90, 93.)

## II.    The 2010 complaint

In June 2009, UMP hired Kimberly VanCleave as a paralegal in its Risk

Management and Contacting departments.  (Spriggs Aff. Ex. A at UMP173.)  Beginning

in August or September of that year, she worked with McNeal on a weekly basis,

addressing matters involving employment-practices liability insurance.  (Id. at UMP174.)

According to VanCleave, approximately one week after her first meeting with

McNeal, he invited her to a happy hour after work, which VanCleave attended; upon

arrival, however, only McNeal was present.  (Id. at UMP175.)  The two discussed work

and had limited conversations about their families and other topics over 30-45 minutes. (Id.)  VanCleave felt that McNeal was "flirty" and appeared to be a "ladies' man," although she did not find his conduct that evening inappropriate.  (Id.)  Later that night, she received a text message from McNeal asking if she was planning to go out that evening, as McNeal wanted to join her if so.  (Id.)

According to VanCleave, McNeal invited her to a second happy hour later that month, and she again attended.  (Id.)  On this occasion, however, McNeal was more overtly flirtatious, referring to her as "baby" and asking about her boyfriends.  (Id. at UMP176.)  He conveyed that he was unhappily married and asked, "you wouldn't date me because I'm married?"  (Id.)  VanCleave interpreted McNeal's conduct as "testing the waters" to see if she would object.  (Id.)  He later gave her a ride to her car and, when she exited, touched her on the knee.  (Id.)  VanCleave did not say anything to McNeal at the time or mention the incident to others.

Following these interactions, VanCleave had difficulty working with McNeal. She felt that he lacked focus and organization and would pepper their conversations with sexual innuendo or propositions, often commenting on her attire or "look."  (Id. at UMP176-77.)  He repeatedly asked her out or to attend events with her, such as basketball games.  (Id.)  He also sent her text messages, asking about her plans after work, her clothing, or asking her on dates.  VanCleave either ignored McNeal's overtures or responded simply with "thank you" or other pleasantries.  (Id. at UMP177.)

In January 2010, VanCleave finally confronted McNeal about his behavior.  (Id.) She told him that she was not interested in playing "flirting games" and that she was

offended by his conduct.  (Id.)  According to VanCleave, McNeal began yelling at her, and she told him that she was going to talk to her supervisor, Ruth Flynn.  (Id. at UMP178.)  VanCleave spoke with Flynn later that same day but reported only that McNeal was "impossible" to work with.  (Id.)  Following the confrontation, however, McNeal stopped making sexual comments and propositioning her.  (Id.)

On Friday, April 30, 2010, VanCleave attended a meeting with McNeal and Eilbracht, at which she reported her concerns about his work; she did not mention his "inappropriate" advances, however.  (Id.)  McNeal responded that he believed VanCleave was incompetent and that he did not need her help to perform his job.  (Id.)  VanCleave became angry and stormed out of the meeting.  (Id.)  After thinking things over that weekend, on Monday, May 3, 2010, she reported McNeal's repeated advances to Flynn; she submitted a written complaint three days later.  (Id. at UMP178-79.)  Her complaint summarized the allegations discussed above and mentioned that other UMP employees had warned her McNeal was a "womanizer" who "tries to relate to women on a sexual level rather than a professional one," and that he had made inappropriate comments (including by text message) to other female employees.  (Id. at UMP173.)

### III.   UMP investigates

The record does not disclose how Eilbracht became aware of VanCleave's complaint to Flynn, but it is undisputed that on May 6, 2010, Eilbracht retained outside counsel to investigate VanCleave's allegations.  (Eilbracht Aff. ¶ 5.)  Eilbracht sought outside involvement because McNeal was a member of UMP's HR department, which

normally would be responsible for investigating reports of sexual harassment.  (Id.)

Eilbracht retained the Littler Mendelson law firm ("Littler") to conduct the investigation.

Between May 7 and 11, 2010, Littler reviewed documents relevant to VanCleave's allegations and interviewed nine persons, including VanCleave, Flynn, other HR employees, and McNeal.  The results of Littler's investigation, including the witness interviews, were summarized in a report dated May 26, 2010 (the "Littler Report"), which appears several times in the record.  (See, e.g., Eilbracht Aff. Ex. A.)  According to the Littler Report:

- VanCleave provided cell phone records that corroborated her contacts with McNeal on the nights of the two happy hours she attended with him.

- HR employee Mary Thao reported that McNeal had commented about her walk and asked her to demonstrate it for another employee.  McNeal remarked that Thao had a "fuck walk," and when she asked him what that meant, he responded it was the type of walk that "makes you want to do them."[2]  He also remarked that he once had to "check himself" to keep from "checking [Thao] out" on an occasion he saw her walking by.

- Thao received a text message from McNeal regarding her "walk," a copy of which she shared with the investigator:

|  |  |
|---|---|
| McNeal: | I saw it again :) |
| Thao: | Got to call my Mom and Da[d] and say Thanks. |
| McNeal: | >3 |
| McNeal: | Tell them I said thanks too. |
| Thao: | Will do. |

---

[2] McNeal points to the statement of another employee (Patricia Washington), who claims that *she* made the "fuck walk" comment.  But Washington also told the investigator that McNeal responded, "I'm not saying that *but something like that*."  (Spriggs Aff. Ex. A at UMP189.)

McNeal:      You gonna get me in trouble.

- Jeanette Griffin, an employee in UMP's Risk Management department, related that at one time she had expressed interest in an open HR position and spoke to McNeal about it.  After telling her that he did not believe she was qualified, McNeal made a comment along the lines of, "what about you and me getting together."  Griffin viewed this as a "vague" proposition and told McNeal it made her uncomfortable.

- Patricia Washington, another HR employee, advised that McNeal engaged in conversations with subordinates touching on sexual topics "once or twice per month."

- HR employee Jill Petty noted that McNeal sometimes participated (along with other HR staff members) in "risqué" lunch conversations or other conversations that "pushed the envelope."  Washington corroborated this.

(Spriggs Aff. Ex. A at UMP179-81, 184-90, 192-94.)

In addition, the Littler Report noted that several witnesses recounted other "inappropriate" comments, albeit not sexually charged, made by McNeal.  Washington, for example, reported that McNeal had used the word "Nigga" during some HR lunches. (Id. at UMP187.)  And Petty related that certain of the lunch conversations involved teasing HR employee Jozene Durant about her national origin.  (Id. at UMP184.)

According to the Littler Report, McNeal was interviewed on May 11, 2010.  He denied engaging in inappropriate conduct or attending a happy hour one-on-one with VanCleave, and he asserted that he had good working relationships with all of his HR colleagues.  He acknowledged, however, that at times he participated in lunch conversations with HR staff that "can become inappropriate," including using the word "Nigga."  He also acknowledged from time to time complimenting VanCleave and Thao on their appearances or clothing but denied making sexual advances toward any

employee.  He also denied sending the text message to Thao, but when confronted with it, he replied that he did not recall having sent it.  He was asked to produce text messages between himself and other UMP employees, but he refused, labeling those messages "personal."  (Id. at UMP202.)

## IV.    Eilbracht terminates McNeal's employment

Following the investigation, Eilbracht reviewed Littler's Report and "had no reason to doubt the information" therein.  (Eilbracht Aff. ¶ 7.)  And according to Eilbracht, based on the information in the Report, she decided to terminate McNeal's employment.  (Id. ¶ 8.)

Eilbracht met with McNeal on June 1, 2010, and informed him that his employment was being terminated.  (Id. ¶ 9.)  According to McNeal, Eilbracht provided no reason for his termination, despite being asked – she simply advised that he was being discharged and offered him a severance package contingent upon him signing a release of all claims against UMP.  (McNeal Aff. ¶¶ 4-7.)  McNeal refused to sign the release.  (Id. ¶ 8.)  To this day, despite acknowledging having met with Littler shortly before his termination, McNeal claims he does not know why he was discharged.[3]

On September 24, 2010, McNeal filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the

---

[3] UMP makes much of this, arguing that if McNeal does not know the reason for his termination, "why should this Court accept his Complaint's unsupported allegations of racism[?]"  (Reply Mem. at 1.)  But while McNeal may not *know* the reason for his termination – something that is true in nearly all employment cases absent a "smoking gun," since an employee cannot get into his employer's head, so to speak – he clearly *believes* it was due to racism, for why else bother to pursue this action?

Minnesota Department of Human Rights.  The charge alleged race and sex discrimination, as well as retaliation.  Nearly five years later, the EEOC issued McNeal a right-to-sue letter, advising that it was unable to establish that discrimination or retaliation had occurred.

On July 30, 2015, McNeal commenced this action against UMP in the Hennepin County District Court, which UMP promptly removed to this Court.  His Complaint alleged claims for race discrimination and retaliation under Title VII and the Minnesota Human Rights Act ("MHRA").  The Court later granted UMP's Motion to Dismiss the MHRA claims,[4] leaving only the Title VII claims for resolution.  With discovery complete, UMP now moves for summary judgment on those claims.  Its Motion has been fully briefed, the Court heard oral argument on December 20, 2016, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of McNeal, there is no genuine issue as to any material fact and UMP is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  UMP bears the burden of showing the material facts in the case are undisputed.

---

[4] The Court dismissed those claims because, under Minnesota law as interpreted by the Minnesota Supreme Court in Beaulieu v. RSJ, Inc., 552 N.W.2d 695, 702 (Minn. 1996), they were time-barred.  (See Doc. No. 24 at 6-9.)  UMP argued the same logic applied to bar the Title VII claims under a laches theory, but the Court rejected that argument, finding laches generally is not amenable to resolution on a motion to dismiss.  (Id. at 9-11.)  In its current Motion, UMP renews its argument that McNeal's Title VII claims are barred by laches.  Because the Court finds the claims fail on the merits, it need not (and does not) reach that argument.

Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[5]

Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view

the evidence, and the inferences that may be reasonably drawn from it, in the light most

favorable to McNeal.  Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v.

Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  McNeal may not rest on mere

allegations or denials, but must show through the presentation of admissible evidence that

specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P.

56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

**ANALYSIS**

**I.      Applicable legal principles**

Title VII renders it unlawful for an employer "to discharge any individual . . .

because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the statute

makes it unlawful to retaliate against an employee for "oppos[ing] any practice made . . .

unlawful" by Title VII.  § 2000e-3(a).  In the absence of "direct evidence" of

discrimination or retaliation, which McNeal does not allege here, the Court analyzes his

claims using the familiar McDonnell Douglas burden-shifting framework.  See, e.g.,

Robinson v. Am. Red Cross, 753 F.3d 749, 754 (8th Cir. 2014).  Under this framework,

McNeal must first establish a prima facie case of discrimination or retaliation.  E.g., id. at

---

[5] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be granted sparingly in discrimination cases.  Because this Court has cited these cases for different legal principles that remain good law, it has not indicated such abrogation.

754, 756.[6]  If he does so, "the burden shifts to [UMP] to articulate a legitimate,

nondiscriminatory reason for [its] action.  If such a reason is proffered, then [McNeal]

must provide evidence from which a reasonable fact finder can conclude that the reason

offered . . . is merely a pretext for" discrimination or retaliation.  Clegg v. Ark. Dep't of

Corr., 496 F.3d 922, 926 (8th Cir. 2007) (internal quotation marks and citations omitted).

Here, the Court will assume arguendo that McNeal has stated a prima facie case of

discrimination and retaliation.  See, e.g., Gibson v. Am. Greetings Corp., 670 F.3d 844,

855 (8th Cir. 2012) (assuming the plaintiff stated a prima facie case and disposing of the

matter on pretext grounds); Anderson v. Durham D&M, L.L.C., 606 F.3d 513, 521 (8th

Cir. 2010) (same).  As already noted, UMP has proffered a legitimate, nondiscriminatory

reason for his discharge, namely, he engaged in inappropriate conduct, as detailed in the

Littler Report.  Accordingly, the dispositive question is:  has McNeal proffered sufficient

evidence to show UMP's reason is a pretext for discrimination or retaliation?  In the

Court's view, the answer is a resounding "No."

## II.    No evidence of pretext

There exist "at least two routes for demonstrating a material question of fact as to

pretext."  Gibson, 670 F.3d at 854 (citation omitted).  "First, a plaintiff may succeed

indirectly by showing the proffered explanation has no basis in fact.  Second, a plaintiff

---

[6] To state a prima facie case of discrimination, McNeal must proffer sufficient evidence that
(1) he is a member of a protected group, (2) he was meeting the legitimate expectations of UMP,
(3) he suffered an adverse employment action, and (4) the adverse employment action occurred
under circumstances permitting an inference of discrimination.  E.g., Clegg v. Ark. Dep't of
Corr., 496 F.3d 922, 926 (8th Cir. 2007).  Similarly, to state a prima facie case of retaliation,
McNeal must proffer sufficient evidence that (1) he engaged in protected activity, (2) UMP
subsequently took materially adverse action against him, and (3) the materially adverse action
was causally linked to his protected activity.  E.g., Robinson, 753 F.3d at 756.

can directly persuade the court that a prohibited reason more likely motivated the

employer." Id. McNeal attempts to show pretext under both routes here, but his

arguments are unavailing.

### A.      No basis in fact

McNeal first argues that UMP's proffered reason has no basis in fact because he

"did not engage in sexual harassment." (Mem. in Opp'n at 20.) He continues to deny

much of the conduct attributed to him, such as calling VanCleave "baby" or touching her

knee, and he argues that many of the other incidents attributed to him have either been

taken out of context or were not viewed by the recipients as inappropriate (such as the

text message to Thao). (See id. at 20-23.) Whatever merit these arguments might have,

they entirely miss the point. The question is not whether McNeal *actually* violated

UMP's harassment policy, but rather whether Eilbracht, the person who terminated his

employment, *had a good-faith belief* he violated the policy. See, e.g., Richey v. City of

Independence, 540 F.3d 779, 784 (8th Cir. 2008) ("The normal rule in discrimination

cases is that if an employer honestly believes that an employee [engaged in] misconduct,

but it turns out later that the employer was mistaken about whether the employee violated

a workplace rule, the employer cannot be liable for discrimination. If the employer takes

an adverse action based on a good faith belief that an employee engaged in misconduct,

then the employer has acted because of perceived misconduct, not because of protected

status or activity."); Scroggins v. Univ. of Minn., 221 F.3d 1042, 1045 (8th Cir. 2000)

("The relevant inquiry is whether the [employer] believed [the employee] was guilty of

the conduct justifying discharge."). And in the Court's view, there exists a dearth of

evidence in the record from which a factfinder could conclude Eilbracht lacked such a belief.

Indeed, despite attempting to minimize his (mis)conduct,[7] McNeal *acknowledges* – both here and during the Littler investigation – at least some of the conduct attributed to him, including commenting on other employees' appearances and attire and discussing prostitution at HR lunches. He also did not (and cannot) legitimately dispute that he sent the text message to Thao, and the investigator corroborated from Washington, Petty, Griffin, and Thao that McNeal had made sexually charged remarks, regardless of whether *they* found them improper. And, of course, VanCleave detailed a litany of sexually tinged statements and conduct by McNeal. The consistent narrative provided by the witnesses during the investigation supplied an ample basis for Eilbracht to believe McNeal had engaged in improper conduct, his denials notwithstanding.[8]

Furthermore, McNeal acknowledged engaging in *other* inappropriate conduct in the workplace. For instance, he admitted using the term "Nigga" during HR lunches and did not deny participating in conversations in which Durant was teased about her national origin. McNeal argues that "[n]one of [this] conduct is relevant to whether [he] engaged

---

[7] In but one example of McNeal trying to diminish his conduct, he argues that "even were [his] behavior as VanCleave has described, she . . . only believed he was 'testing the waters' to see what her response would be." (Mem. in Opp'n at 22.) This argument is bizarre, suggesting that harassing conduct designed to "test the waters" is somehow insulated from impropriety. By this logic, a male employee could expose himself to a female colleague and not be guilty of sexual harassment, if he were only "testing" to see how the colleague might respond.

[8] Among other things, UMP's harassment policy provides examples of inappropriate conduct, including "unwelcome sexual advances; repeated sexually oriented kidding, teasing, joking, or commentary; [and] commentary about an individual's body." (Spriggs Aff. Ex. A at UMP556.) Contrary to McNeal's assertion at oral argument, conduct need not be "unwelcome" to transgress this policy.

in sexual harassment," but he again misses the mark, as UMP does not assert he was discharged only for *sexually* inappropriate conduct.  Rather, the Littler Report detailed improper conduct of both a sexual and non-sexual nature, including the "Nigga" comments, and Eilbracht averred that she opted to terminate McNeal's employment "based on [the] report."  (Eilbracht Aff. ¶ 8.)  In other words, UMP's position is that it was misconduct generally, *including* sexually inappropriate misconduct, that led to McNeal's termination.  And that decision is amply supported by the record – as UMP notes, McNeal's admitted conduct "would be extremely inappropriate for any employee," but *especially* improper for "a Human Resources supervisor."  (Def. Mem. at 14.)[9]

### B. More likely motivated by race or retaliation

McNeal also attempts to show pretext by arguing that his race, or an intent to retaliate, "more likely motivated" UMP's decision to terminate his employment.  Gibson, 670 F.3d at 854.  An employee attempting to show pretext in this fashion may offer evidence that his employer "(1) failed to follow its own policies, (2) treated similarly [] situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  Id.  McNeal argues that evidence of all three is present here, but his arguments lack merit.

---

[9] Citing the notes of an EEOC investigator, McNeal argues that by "Eilbracht's own admission, VanCleave's complaints . . . were not the basis of [his] termination."  (Mem. in Opp'n at 27.)  But UMP nowhere argues it was VanCleave's *complaints* that formed the basis for his discharge.  Rather, it was the facts uncovered during the investigation *into* those complaints that led Eilbracht to terminate McNeal's employment.  That is consistent with the investigator's notes, which indicate that Eilbracht believed the text message sent to Thao was "more serious" than VanCleave's complaints, given that McNeal was Thao's supervisor.  (Spriggs Aff. Ex. A at UMP327.)

McNeal first contends that UMP failed to follow its own policies, claiming "the investigation did not establish that [he] violated the sexual harassment policy, nor does the policy require that if harassment occurred, termination was required." (Mem. in Opp'n at 27.) This is a difficult proposition to accept, given the harassment policy lists "commentary about an individual's body" as inappropriate conduct – which is amply demonstrated here by the "fuck walk" comment and the text message to Thao. In any event, the Littler Report does not appear to have been designed to reach any *conclusions* about whether McNeal did, or did not, violate UMP's harassment policy. Indeed, it offers no such conclusions, but simply recites the *facts* uncovered during the investigation. It was up to Eilbracht to decide what to do with those facts, and as already noted, she determined that they justified McNeal's discharge. Furthermore, while McNeal is correct that discharge was not *required* for violations of UMP's harassment policy, the policy specifically provides that "[f]ailure by any employee to adhere to this policy will result in disciplinary action, *up to and including termination*." (Spriggs Aff. Ex. A at UMP555 (emphasis added).)

At oral argument, McNeal also asserted (for the first time) that Eilbracht's offer of severance at his termination belies the contention he violated company policy. According to McNeal, if he had in fact violated the harassment policy, there would have been no reason for the company to offer him severance in exchange for a release. The offer, he argues, therefore suggests the company is dissembling. But the offer of severance to a terminated employee in return for a release is not uncommon, see, e.g., Shelton v. Techpack Am., Inc., No. 2:10-CV-89, 2011 WL 1813975, at *9 (E.D. Tenn.

May 6, 2011) ("Companies often make a business decision to offer terminated employees severance and other benefits in exchange for a release."), particularly where, as here, the employee is a member of a racial minority, see Courtney v. Biosound, Inc., 42 F.3d 414, 420 (7th Cir. 1994) ("[N]o inference of guilt can be drawn from a company's sensitivity to its potential liability . . . when discharging a protected . . . worker.").  This Court agrees with the myriad of others that have held "[t]he mere offer of money in exchange for a release of all claims does not by itself raise an inference that [the employer's] articulated reasons for discharging [the plaintiff] are pretextual." Mundy v. Household Fin. Corp., 885 F.2d 542, 547 (9th Cir. 1989); accord, e.g., Shelton, 2011 WL 1813975, at *9 (offer of severance in exchange for release "in no way casts doubt on the validity of the reasons articulated for [the plaintiff's] termination"); EEOC v. Republic Servs., Inc., 640 F. Supp. 2d 1267, 1300 (D. Nev. 2009) (an offer of a severance agreement "does not itself raise an inference of pretext"); Haynes v. Gernsbacher's, Inc., No. 4:01-CV-594-A, 2002 WL 1783905, at *4 (N.D. Tex. July 31, 2002); McDaniel v. EagleCare, Inc., No. IP 00-0413-C-T/K, 2002 WL 655691, at *10 (N.D. Ind. Mar. 8, 2002); Waldemar v. Am. Cancer Soc'y, 971 F. Supp. 547, 554 (N.D. Ga. 1996).

McNeal next argues that UMP treated similarly situated employees differently. He notes that another HR employee, Tyler Rogstad, stated on a conference call with an outside vendor that one of its employees had a name resembling that of a pornographic actress.  The record does not disclose when the conference call occurred or the identity of

Rogstad's supervisor at the time.[10]  Regardless, the comment was reported to Greg

Brodersen, whose title is not evident, and Rogstad then received a verbal reprimand from

Brodersen.  This "disparate treatment," asserts McNeal, evidences pretext:  McNeal's

employment was terminated while Rogstad received only a reprimand.  (Mem. in Opp'n

at 27-28.)  There are, however, a plethora of problems with this argument.

First, McNeal has nowhere cited evidence of Rogstad's race, which dooms his

attempted comparison *ab initio*.  Indeed, if Rogstad were in fact African American, no

inference of racial discrimination would arise from the allegedly "disparate" treatment.

This is why, in order for this type of comparison to be probative, a plaintiff must proffer

evidence that his comparator is "outside [his] protected class."  Tolen v. Ashcroft, 377

F.3d 879, 882 (8th Cir. 2004).[11]  Second, to be "similarly situated," Rogstad and McNeal

must have been alike "in all relevant respects – a rigorous standard at the pretext stage."

Torgerson, 643 F.3d at 1051 (internal quotation marks and citations omitted).  The record

simply does not support that conclusion here.  As already noted, McNeal points to no

*evidence* indicating that Rogstad reported to Eilbracht – indeed, he was reprimanded by

someone else, belying that suggestion – and "when different decision-makers are

_____

[10] McNeal argues, without citation to the record, that Rogstad reported directly to Eilbracht.  (See Mem. in Opp'n at 28.)  Nevertheless, the Court has located two organizational charts in the record indicating that Rogstad reported to Eilbracht in 2007.  (See Spriggs Aff. Ex. A at UMP137-38.)  It is unclear, however, if that was the case when Rogstad's comment was made.

[11] McNeal asserts, again without citation to the record, that Rogstad is white.  (See Mem. in Opp'n at 11 ("Rogstad, a Caucasian HR employee . . . .").)  While there is, in fact, evidence in the record supporting that assertion (see Washington Decl. ¶ 10), the Court "is not required to speculate on which portion of the record [McNeal] relies, nor is it obligated to wade through and search the entire record for some specific facts that might support [his] claim."  Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 915 (8th Cir. 2007) (citation omitted).

involved, two [employees] are rarely similarly situated in all relevant respects," Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864-65 (8th Cir. 2008) (citation omitted).  Third, but perhaps most importantly, to be similarly situated, Rogstad and McNeal must have engaged in "the same or similar conduct."  Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 852 (8th Cir. 2005).  Rogstad was accused of making an inappropriate comment to an outside vendor about her name, while McNeal was accused of repeatedly propositioning VanCleave and touching her knee, and the subsequent investigation revealed that he frequently used sexual innuendo, made comments about other employees' appearances and attire, and sent at least one suggestive text message to a subordinate.  The Court easily concludes the conduct at issue is not of "comparable seriousness."  Wimbley v. Cashion, 588 F.3d 959, 963 (8th Cir. 2009).[12]

McNeal next tries to show pretext by arguing UMP has offered "shifting explanations" for the termination of his employment.  (Mem. in Opp'n at 28-29.)  To be sure, shifting explanations for a plaintiff's discharge can suggest pretext, but there is no evidence of shifting explanations here.  Rather, McNeal's argument is predicated on his allegation that Eilbracht did not give him a reason for his termination when he was fired, but UMP now claims he was fired for violating its policies.  (Id. at 28-29 ("There is no documentation in McNeal's personnel file or otherwise indicating termination resulted from a policy violation [and] McNeal was not provided an explanation.").)  Yet, not

---

[12] McNeal also claims that Rogstad propositioned Washington and commented about Thao's appearance.  (Mem. in Opp'n at 28.)  But the only evidence in the record regarding these matters reveals that they were first reported to UMP as part of its 2010 investigation into VanCleave's complaints, and by that juncture Rogstad was no longer employed by UMP.

being *provided* a reason is different than the *absence* of a reason, and nothing in the record is inconsistent with UMP's assertion that McNeal was fired based on the Littler investigation.  Notably, even as far back as 2010, in its response to McNeal's EEOC charge, UMP asserted that "an employee complained about Mr. McNeal's behavior towards her, alleging that it was inappropriate.  [UMP] hired an outside investigator to perform a thorough investigation [and] McNeal was involuntarily terminated effective June 1, 2010 as a result of inappropriate behavior."  (2d Nyhus Aff. Ex. G.)  There is simply no shift here.[13]

Lastly, McNeal attempts to show pretext by arguing racism was rampant at UMP, citing a handful of matters allegedly buttressing that assertion.  (*See* Mem. in Opp'n at 29-31.)[14]  He nowhere explains, however, why an entity purportedly bent upon race discrimination would hire him as its Manager of *Diversity* and Recruitment and task him with, in his own words, "enforcing . . . protocol[s] to eliminate bias," and then fire him due to his race (or complaints about race).  (Mem. in Opp'n at 23.)  But even were the Court to assume the truth of his allegations, it would do little to aid his cause, as he does not dispute that *Eilbracht* was the lone person who made the decision to terminate his

---

[13] McNeal argues that changing reasons also are evidenced by UMP arguing, in support of summary judgment, that he "failed to cooperate" in Littler's investigation.  (Mem. in Opp'n at 29.)  But there is no contradiction, as the Littler Report clearly indicates McNeal refused to turn over his text messages when asked.  (Spriggs Aff. Ex. A at UMP202.)

[14] McNeal points to, among other things, (1) the racially charged emails he received in 2008, (2) the implementation of an English-only policy at a UMP clinic, (3) claims that others complained HR had become "significantly more racially diverse" after his hiring, (4) allegations that he could not be impartial when investigating complaints against African American employees, (5) being subjected to rumors and innuendo about relationships with co-workers, and (6) minority employees receiving lower performance evaluations than non-minority ones.  (*See* Mem. in Opp'n at 29-31.)

employment.  Eilbracht, of course, is the very person who reached out to McNeal to recruit him to UMP, and it is "unlikely a supervisor would hire an . . . employee and then discriminate [against him.]  [S]uch evidence creates a presumption against discrimination."  Haigh v. Gelita USA, Inc., 632 F.3d 464, 470 (8th Cir. 2011).  Further, McNeal could not say in his deposition that he believed Eilbracht was racist (McNeal Dep. at 65), and the record undermines any such assertion.  Notably, when McNeal received racially charged emails in 2008 and forwarded them to Eilbracht, she immediately responded that she found them "disgusting" and "disturbing" and contacted UMP's information-services department in order to take action against the sender.  Furthermore, Eilbracht *declined* on one occasion to terminate McNeal's employment even though a supervisor recommended she do so because the supervisor believed McNeal was a racist.  The evidence simply does not support the suggestion that Eilbracht, the decisionmaker here, was in any way motivated by McNeal's race.

## CONCLUSION

All told, McNeal has failed to create a genuine issue that race or retaliation played a role in UMP's termination of his employment.  Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that UMP's Motion for Summary Judgment (Doc. No. 36) is **GRANTED** and McNeal's Complaint (Doc. No. 1, Ex. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  January 23, 2017

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

- 21 -